Vivek Shah
1301 N. Broadway, Ste. 32167
Los Angeles, CA 90012
Telephone: (224) 246-2874
Email: newvivekshah@gmail.com

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| VIVEK SHAH,<br>Plaintiff,<br>v.<br>CRAIN COMMUNICATIONS, INC.,<br>Defendant. | Case No. 2:26-cv-03070-RGK-AGR<br>Assigned to Hon. R. Gary Klausner<br>**FIRST AMENDED COMPLAINT FOR:**<br>**(1) VIOLATIONS OF CAL. PENAL CODE § 631(a) (SIXTY SEPARATE VIOLATIONS); AND**<br>**(2) INTRUSION UPON SECLUSION**<br>**DEMAND FOR JURY TRIAL**<br>*[Filed as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1)(B)]* |

## INTRODUCTION

1. This is a civil action under the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631(a), and California common law, arising from Defendant Crain Communications, Inc.'s real-time interception — and aiding, agreeing with, and employing of third parties' real-time interception — of the

contents of Plaintiff's electronic communications while Plaintiff used the on-site search function of Defendant's website, https://adage.com (the "Website").

2. Defendant publishes Ad Age, an advertising-industry trade publication. Defendant monetizes the Website not only through subscriptions and display advertising but by harvesting data about its visitors and supplying it to advertising-technology companies. To that end, Defendant deliberately embedded, configured, and maintained third-party tracking code on the Website — including the Meta Pixel, the LinkedIn Insight Tag, Chartbeat's real-time analytics beacon, and Google advertising and analytics tags — that operates as a hidden, automated wiretap on the Website's search bar.

3. When Plaintiff typed search queries into the Website's search bar and pressed enter — including a query consisting of Plaintiff's own name — Defendant's embedded third-party code caused the exact, verbatim contents of those queries to be transmitted contemporaneously, in real time, from Plaintiff's browser to servers operated by Meta Platforms, Inc. ("Meta"), LinkedIn Corporation ("LinkedIn"), Chartbeat, Inc. ("Chartbeat"), and Google LLC ("Google") (collectively, the "Tracking Companies"), embedded in the parameters of outbound network requests.

4. These interceptions occurred without any prior consent — the trackers fired the moment each page loaded, before Defendant's cookie banner

could even be read, let alone acted upon — and they continued after Plaintiff, on his very first visit and on every visit thereafter, affirmatively selected the banner's "Opt-out" option rather than "Accept." Defendant's own interface solicited Plaintiff's refusal of tracking and then disregarded it.

5. Plaintiff knows the interceptions occurred because he watched them occur. Using the network-inspection panel of standard browser developer tools, Plaintiff personally observed and documented — request by request — his search term embedded in the payloads of network transmissions to facebook.com, px.ads.linkedin.com, ping.chartbeat.net, and Google advertising endpoints. (Ex. A [developer-tools captures]; Ex. B [search page with Google/DoubleClick request firing on load].) In a single documented search, no fewer than thirty-three separate outbound network requests containing Plaintiff's search term left Plaintiff's browser for third-party servers.

6. Section 631(a) imposes liability on anyone who willfully and without the consent of all parties reads, attempts to read, or learns the contents of a communication while in transit, and — in its fourth clause — on anyone who "aids, agrees with, employs, or conspires with" another to do so. The Tracking Companies violated the second clause; Defendant violated the fourth by intentionally embedding, configuring, profiting from, and refusing to disable the interception architecture.

7. Plaintiff seeks statutory damages of $5,000 for each of sixty separate violations pursuant to Cal. Penal Code § 637.2, compensatory and punitive damages for intrusion upon seclusion, and injunctive relief.

**JURISDICTION AND VENUE**

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Plaintiff is a citizen of California, domiciled in Los Angeles County. Defendant is organized under the laws of the State of Illinois with its principal place of business in Detroit, Michigan, and is therefore a citizen of Illinois and Michigan. *See* Defendant's Rule 7.1 Corporate Disclosure Statement. Complete diversity exists.

10. A plaintiff's good-faith allegation of the amount in controversy controls unless it appears to a legal certainty that the claim is really for less than the jurisdictional amount. Plaintiff's claims place at least $375,000 in controversy, itemized as follows.

11. **Statutory damages: $300,000.** Cal. Penal Code § 637.2(a)(1) authorizes statutory damages of $5,000 "per violation," without proof of actual damages, § 637.2(c). Each discrete interception of a communication is a separate

violation. *Bliss v. CoreCivic, Inc.*, 978 F.3d 1144 (9th Cir. 2020) (each separate interception is a separate "violation"; rejecting the collapse of multiple interceptions into one merely because they flow from a common scheme); *Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021) (applying *Bliss* to CIPA: each interception is a separate violation). As detailed in Section IV and the table at ¶ 74 below, Plaintiff submitted fifteen (15) distinct search queries through the Website's search bar during the limitations period, and the verbatim contents of each query were separately acquired by each of four distinct third-party recipients — Meta, LinkedIn, Chartbeat, and Google — each acquisition constituting a discrete, separately actionable violation. Fifteen queries × four interceptions per query = sixty violations × $5,000 = $300,000.

12. **Injunctive relief: not less than $50,000.** Section 637.2(b) expressly authorizes injunctive relief. In a single-plaintiff case, the amount in controversy includes the cost to the defendant of complying with the requested injunction. Compliance here would require Defendant to audit, reconfigure, or remove a tracking and consent architecture spanning at least four third-party vendors integrated throughout the Website — including re-engineering its consent-management implementation so that no tracking fires before, or in disregard of, a visitor's consent election — at an engineering, vendor, and compliance cost reasonably estimated to exceed $50,000.

13. **Intrusion upon seclusion — compensatory and punitive damages: not less than $25,000.** Plaintiff seeks compensatory damages of not less than $12,500 for the loss of control over his personal information, the unauthorized identity-linked profiling of his communications, and the attendant distress and chilling of his online activity, together with punitive damages under Cal. Civ. Code § 3294 for Defendant's willful disregard of Plaintiff's express refusal of tracking. Punitive damages are properly included in the amount in controversy, *Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 240 (1943), at no less than a 1:1 ratio, *Greene v. Harley-Davidson, Inc.*, 965 F.3d 767, 771–72 (9th Cir. 2020).

14. It accordingly does not appear to a legal certainty — nor is it even arguable — that Plaintiff's claims are for $75,000 or less. The statutory-damages component alone, conservatively counted against only the four documented recipients, exceeds the threshold more than threefold.

15. This Court has specific personal jurisdiction over Defendant. Under *Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025) (en banc), an interactive platform expressly aims its wrongful conduct at California when its forum contacts are its own deliberate choice and not random, isolated, or fortuitous — even if it cultivates a nationwide audience for commercial gain.

16. Defendant knew, in real time, that Plaintiff was located in California. Like virtually all advertising-supported websites, the Website determines each visitor's geographic location — by geolocating the visitor's IP address — between the moment a page is requested and the moment it renders, and uses that geolocation to serve geotargeted advertising and to conduct real-time programmatic advertising auctions. Defendant's advertising stack identified Plaintiff as a California visitor at the moment of each violation and monetized that fact.

17. Defendant deliberately extracts and commercializes California visitors' data: it embedded the Meta Pixel, LinkedIn Insight Tag, Chartbeat beacon, and Google tags precisely so that visitor data — including the data of the enormous California audience of an advertising-industry publication — would be collected, transmitted, and exploited for advertising revenue, audience building, and conversion measurement. That is the conduct *Briskin* held sufficient.

18. Defendant also maintains direct, deliberate commercial contacts with California: it sells Ad Age subscriptions to California residents; it sells advertising reaching California audiences, including advertising placed by California-headquartered companies; its editorial product is centered on an industry with its largest concentrations in Los Angeles and the San Francisco Bay

Area, whose participants Defendant courts as readers, subscribers, advertisers, and event attendees; and it runs paid campaigns promoting Ad Age on the Meta and LinkedIn advertising platforms — sixty-two on LinkedIn and approximately twenty-four on Meta as of June 11, 2026 (Exs. C, D) — campaigns whose performance Defendant measures through the very Pixel and Insight Tag conversion data at issue in this action.

19. Defendant's relationship with LinkedIn is itself governed by LinkedIn's User Agreement, which provides that disputes concerning LinkedIn's services are governed by California law and litigated exclusively in the federal or state courts of Santa Clara County, California — a contractual submission to this State's law and courts in connection with the very tracking services at issue here.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claims occurred in this District: Plaintiff was located in Los Angeles County when each interception occurred, the intercepted communications originated here, and the injury was suffered here.

## PARTIES

21. Plaintiff Vivek Shah is, and at all relevant times was, a natural person and citizen of California residing in Los Angeles County.

22. Defendant Crain Communications, Inc. is an Illinois corporation with its principal place of business in Detroit, Michigan. Defendant owns and operates Ad Age and the Website, and at all relevant times exercised exclusive control over the Website's source code, including the decision to embed, configure, and maintain the third-party tracking code described herein.

23. Whenever this Complaint refers to acts of Defendant, those acts were authorized, directed, or ratified by Defendant's officers, managing agents, or employees acting within the scope of their authority.

## FACTUAL ALLEGATIONS

### A. Defendant's Data-Driven Business Model

24. Defendant operates the Website as an advertising-supported trade publication. Defendant's Website revenue depends on (a) selling advertising space, including programmatically auctioned space whose price is a function of what is known about each visitor; (b) selling subscriptions; and (c) promoting Ad Age through paid campaigns on social-media advertising platforms.

25. To maximize that revenue, Defendant installed software supplied by third-party advertising and analytics companies directly into the Website's code. That software does not help Defendant render its pages. It is designed to collect data about each visitor — identity signals, device characteristics, geolocation, on-

site behavior, and the contents of on-site communications — and to transmit that data to the third parties' own servers, where it is put to the third parties' own commercial uses.

26. Both Defendant and the Tracking Companies profit from this arrangement. Defendant obtains higher advertising yields, real-time audience analytics, retargeting capability, and conversion measurement for its own paid campaigns. The Tracking Companies obtain a continuous feed of behavioral data — including the contents of visitors' search communications — that they incorporate into their own advertising, identity-resolution, and analytics products sold across the internet.

27. Defendant runs a substantial number of paid marketing campaigns promoting Ad Age on the LinkedIn and Meta platforms. As of June 11, 2026, LinkedIn's public Ad Library reflected sixty-two (62) Ad Age advertising campaigns targeting the United States (Ex. C), and Meta's public Ad Library reflected approximately twenty-four (24) active Ad Age campaigns running across Facebook, Instagram, and related Meta platforms, each linking to adage.com (Ex. D). The effectiveness of those campaigns is measured through the same LinkedIn Insight Tag and Meta Pixel that intercepted Plaintiff's communications: the tags report to LinkedIn and Meta which platform users later

visited the Website and what they did there, closing the advertising loop for Defendant's benefit.

### B. The Website's Search Function and Plaintiff's Search Communications

28. The Website includes a prominent search bar inviting visitors to type free-form text queries to locate content. A search query is a communication from the visitor to Defendant: the visitor composes a message — the search terms — and transmits it by wire to Defendant's server, which responds with results.

29. When a visitor submits a query, the Website navigates to a results page whose URL embeds the visitor's exact search terms as a query-string parameter, in the form https://adage.com/search/?s=[SEARCH TERMS]. Defendant designed and controls this URL structure.

30. During the limitations period, including on or about October 31, 2025, Plaintiff accessed the Website from his computer while located in Los Angeles County, California, and submitted fifteen (15) distinct search queries through the Website's search bar, each enumerated in the table at ¶ 74 below.

31. On October 31, 2025, at approximately 8:20 a.m. GMT, Plaintiff typed his own first name into the Website's search bar and submitted it, producing the results page https://adage.com/search/?s=VIVEK (displaying "Search Results (14): 'VIVEK'"). On or about October 2025, and before that

date, Plaintiff submitted through the same search bar fourteen additional queries — the names of seven major financial institutions (JPMorgan Chase, Bank of America, Citigroup, Wells Fargo, Goldman Sachs, Morgan Stanley, and Capital One) and their seven respective chief executive officers (Jamie Dimon, Brian Moynihan, Jane Fraser, Charlie Scharf, David Solomon, Ted Pick, and Richard Fairbank). Each was a distinct text message Plaintiff composed and submitted, the verbatim terms of each embedded in the corresponding results-page URL and enumerated in the table at ¶ 74. Together, these fifteen queries disclose both Plaintiff's identity and the specific subjects of his financial and business research.

32. A search for one's own name is a communication of singular sensitivity and revelatory power. It simultaneously discloses (a) the user's identity — the message *is* the user; (b) the fact that the user is monitoring his own public profile, reputation, and press coverage; and (c) when captured by identity-resolution systems of the kind described below, a confirmed, self-authenticated linkage between the person's name and the person's device, browser, and browsing activity. Unlike an IP address, a device identifier, or other machine-generated metadata, the query is pure user-generated message content: the words Plaintiff composed and intentionally conveyed to Defendant.

33. Plaintiff reasonably expected that the words he typed into Defendant's search bar were a private exchange between himself and Defendant

— not a communication being silently duplicated, in real time, to four of the largest commercial data-collection enterprises on the internet.

### C. The Interception Architecture

34. Unknown to Plaintiff at the time of his communications, Defendant had embedded in the Website's code tracking and analytics scripts supplied by Meta, LinkedIn, Chartbeat, and Google, each selected, registered, and configured by Defendant to execute automatically in every visitor's browser on every page load — including search-results pages whose URLs Defendant designed to embed visitors' verbatim search terms.

35. **The Meta Pixel.** Defendant installed the Meta Pixel under Defendant's Meta Pixel ID 444187019640480. On each search-results page load, the Pixel fired a GET request from Plaintiff's browser to https://www.facebook.com/tr/, transmitting to Meta's servers, among other things: Defendant's Pixel ID; an ev=PageView event; a dl ("destination location") parameter containing the complete results-page URL — *including Plaintiff's verbatim search terms* (dl=https%3A%2F%2Fadage.com%2Fsearch%2F%3Fs%3DVIVEK); the page title ("Search Results – Ad Age"); a millisecond-precision timestamp; Plaintiff's screen dimensions; and the value of Meta's _fbp browser-identifier cookie, which Meta uses to match web activity to specific Meta accounts and advertising

profiles. Meta's server received the request and returned HTTP 200. (Ex. A, at 3 [Meta Pixel capture]). Defendant is itself a Meta advertiser: Meta's public Ad Library reflects approximately twenty-four active Ad Age advertising campaigns running across Facebook, Instagram, and related Meta platforms, each linking back to adage.com (Ex. D) — campaigns whose conversions Defendant measures through this same Pixel.

36. **The LinkedIn Insight Tag.** Defendant installed LinkedIn's Insight Tag under Defendant's LinkedIn Partner ID 2790241. On each search-results page load, the Tag fired a GET request from Plaintiff's browser to https://px.ads.linkedin.com/attribution_trigger, transmitting to LinkedIn the Partner ID, a millisecond-precision timestamp, and a url parameter containing the complete results-page URL *including Plaintiff's verbatim search terms*. LinkedIn's server received the request, returned HTTP 200, and — in the very same exchange — wrote persistent identification cookies onto Plaintiff's browser, including a bcookie scoped to the entire .linkedin.com domain with an expiration one full year later (October 31, 2026) and a lidc routing cookie. (Ex. A, at 2 [LinkedIn Insight Tag capture].) LinkedIn markets the Insight Tag to website operators as "unlock[ing] powerful demographic insights about your website visitors, including their job titles, companies, industries, and more," and uses Insight Tag data — through cookies and identifiers including li_sugr (used

"to make a probabilistic match of a website visitor's identity") and UserMatchHistory (used for identity synchronization across websites) — to match website visitors to identified LinkedIn member accounts and to build retargetable audience profiles. Defendant is itself a LinkedIn advertiser: LinkedIn's public Ad Library reflects sixty-two Ad Age advertising campaigns targeting the United States (Ex. C) — campaigns whose conversions Defendant measures through this same Insight Tag.

37. **Chartbeat.** Defendant installed Chartbeat's real-time analytics beacon. On each search-results page load, the beacon fired a GET request from Plaintiff's browser to https://ping.chartbeat.net/ping, transmitting to Chartbeat the host (h=adage.com), a persistent per-browser user identifier (the u= parameter), Plaintiff's screen and viewport geometry, and a PA parameter containing the complete results-page URL *including Plaintiff's verbatim search terms*. Chartbeat's server received the request and returned HTTP 200. (Ex. A, at 1 [Chartbeat capture].) Chartbeat's entire product is the contemporaneous *reading* of such data: it ingests, parses, and displays visitor activity in real-time dashboards within seconds of the underlying communication, and aggregates the data into cross-publisher benchmarking and audience-intelligence products of its own.

38. **Google.** Defendant installed Google advertising and analytics tags, including Google Publisher Tag ad requests served through Google's DoubleClick infrastructure. As shown in Exhibit B, a Google/DoubleClick advertising request (googleads.g.doubleclick.net) fires on page load. On each search-results page load, these tags fired requests from Plaintiff's browser to Google advertising endpoints (including googleads.g.doubleclick.net and associated ads?pvsid= publisher-ad requests) whose parameters and referrer data embedded the results-page URL *including Plaintiff's verbatim search terms*, which Google used contemporaneously to select, target, and auction the advertisements displayed alongside Plaintiff's own search results. Google incorporates such data into its own advertising-profile and audience products.

39. Plaintiff documented these transmissions using the network-inspection panel of standard browser developer tools, filtering captured network traffic for his own search term. The filter matched 33 of 486 requests in one capture, 28 of 362 in a second, and 30 of 410 in a third — on a single search, dozens of separate outbound transmissions left Plaintiff's browser carrying his verbatim search terms to third-party servers. (Ex. A.) The same architecture, operating automatically, uniformly, and indiscriminately, intercepted each of Plaintiff's fifteen queries in the identical manner.

40. On information and belief, additional third-party advertising endpoints embedded by Defendant — including endpoints operated by X Corp. (twitter/X adsct requests) and supply-side advertising platforms such as StackAdapt (saq_pxl requests), each visible in the captures at Exhibit A — also received Plaintiff's search terms in the same manner. The sixty violations enumerated below conservatively count only the four documented recipients.

### D. The Interceptions Occurred in Real Time, While the Communications Were in Transit

41. Each transmission described above occurred contemporaneously with Plaintiff's communication to Defendant. The tracker requests fire as part of the same page-load sequence triggered by Plaintiff's submission of his query: as Plaintiff's browser transmits the query to Defendant's server and renders the response, Defendant's embedded code causes a parallel, simultaneous duplication of the query's contents to each Tracking Company's servers. The millisecond timestamps captured in Exhibit A — LinkedIn at epoch 1761898818189, Meta at epoch 1761898818202, thirteen milliseconds apart — confirm machine-speed, real-time acquisition during the communication exchange.

42. This was not retrieval from storage after the fact. The Tracking Companies acquired the contents of Plaintiff's communications during

transmission, before the communication exchange between Plaintiff and Defendant was complete — "similar to how a 'bug' or wiretap can capture audio information." *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814 (E.D. Cal. 2025).

43. Each Tracking Company also read and processed the contents upon contemporaneous receipt: Meta parsed the dl parameter to log a PageView event against its matched profile in real time; LinkedIn parsed the url parameter and synchronized identity cookies in the same round-trip; Chartbeat parsed and rendered the data into real-time dashboards within seconds; and Google parsed the data to select and auction advertising on the very page responding to Plaintiff's query.

44. The simultaneous, unauthorized duplication and forwarding of an unknowing user's communications to third parties is precisely the conduct the Ninth Circuit has condemned: "permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

**E. No Prior Consent: The Trackers Fired Before Any Consent Could Be Given**

45. Section 631(a) requires the prior consent of all parties to a communication; consent obtained after interception has begun is no consent at all. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022). Defendant obtained no consent from Plaintiff — prior or otherwise.

46. The Website displays a small cookie notice in the bottom margin of the page reading: "By using this site, you agree with our use of cookies. Please see our privacy statement for more information," followed by "Accept" and "Opt-out" buttons and the phrase "Please select your preference." (Ex. B.)

47. The banner is sequenced to be meaningless. As Exhibits A and B demonstrate, the tracking requests carrying Plaintiff's data fired the moment each page loaded — before the banner could be read and before any "preference" could be "select[ed]." By the time the banner appeared at the bottom of Plaintiff's screen, his communications had already been transmitted to Meta, LinkedIn, Chartbeat, and Google. *See Garcia v. Anschutz Ent. Grp., Inc.*, No. 5:25-cv-02282, 2026 WL 1278912 (C.D. Cal. May 5, 2026) (consent selection "ineffective because there was a period that the website did collect, track, and transmit her information before she was able to direct it not to").

48. The banner is also legally deficient on its face. It is a browse-wrap notice of the kind the Ninth Circuit holds unenforceable: inconspicuous text in the page's bottom margin that does not identify the third parties receiving visitor

data, does not disclose that the contents of search communications will be transmitted to anyone, and does not condition use of the site on any unambiguous manifestation of assent. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022).

49. Plaintiff never accepted. Each time Defendant's cookie banner appeared — beginning with Plaintiff's very first visit to the Website and on every visit thereafter — Plaintiff selected the banner's "Opt-out" option, expressly refusing Defendant's use of tracking cookies; at no point did Plaintiff select "Accept." Defendant disregarded Plaintiff's election every time: the identical tracking requests continued to fire, and the verbatim contents of Plaintiff's search communications continued to be transmitted to Meta, LinkedIn, Chartbeat, and Google, exactly as before, as reflected in the captures at Exhibit A. Defendant's interface solicited Plaintiff's refusal and then overrode it on each occasion.

50. Plaintiff at no time consented — expressly or impliedly — to the interception of the contents of his communications by Meta, LinkedIn, Chartbeat, Google, or any other third party. Whatever notice the banner gave of Defendant's *own* "use of cookies," it said nothing about third parties acquiring the contents of Plaintiff's search communications, and consent to one party is not consent to all. *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891 (N.D. Cal. 2023); *Brown v.*

*Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D. Cal. 2021) ("consent is not an all-or-nothing proposition").

51. Plaintiff's continued and subsequent use of the Website does not constitute consent. Every visit Plaintiff made was preceded by his affirmative election of "Opt-out" — beginning with the first — so there is no notice-then-acceptance sequence from which consent could be implied. Plaintiff used the Website with the expectation, invited by Defendant's own consent interface, that his stated "preference" would be honored. The violation of that solicited expectation is the injury, not an assumption of the risk of it. *Gabrielli v. Haleon US Inc.*, 815 F. Supp. 3d 852 (N.D. Cal. 2025) (plaintiff's selection of an option "that seemingly allowed [him] to reject" tracking "contradicts any argument that [he] had notice of [defendant's] alleged wrongdoing"); *Garcia v. Anschutz*, *supra* (visitor's expectation that an opt-out would be honored preserved standing and non-consent even where visits were made to document violations); *Shah v. MyFitnessPal, Inc.*, 2026 WL 216334 (N.D. Cal. Jan. 27, 2026) ("A reasonable visitor . . . who chose to opt out of optional cookies would thus reasonably expect [the operator] not to install such cookies on their devices.").

## F. The Tracking Companies Are Third-Party Eavesdroppers Acting for Their Own Purposes

52. None of the Tracking Companies is a party to the communications between Plaintiff and Defendant. Each is a separate enterprise that acquired the contents of Plaintiff's communications for its own commercial exploitation — not a passive recording instrument used solely for Defendant's benefit.

53. **Meta** incorporates Pixel data into its own advertising systems: it matches transmissions to identified Meta accounts via the _fbp cookie and its identity graph; uses the data to build and refine behavioral and advertising profiles; targets and retargets advertising on and off Meta's platforms; measures conversions for its entire advertiser base; and trains its targeting models. *See In re Meta Android Privacy Litig.*, No. 25-cv-04674, 2026 WL 1279416 (N.D. Cal. May 11, 2026) (Meta Pixel's interception of search-bar queries actionable under § 631(a)).

54. **LinkedIn** incorporates Insight Tag data into its own advertising systems: it resolves website visitors to identified LinkedIn member accounts; enriches member profiles with off-LinkedIn browsing data; builds matched and lookalike audiences sold to its entire advertiser base; and tracks members across every website deploying the Tag through the persistent cookies it wrote onto Plaintiff's browser. *See Jackson v. LinkedIn Corp.*, 744 F. Supp. 3d 986 (N.D. Cal. 2024) (LinkedIn, receiving data through the Insight Tag, is a third party to the user's communication with the host website and subject to § 631(a)).

55. **Chartbeat** incorporates beacon data into its own products: real-time and historical analytics dashboards, cross-publisher benchmarking, headline testing, and audience-intelligence offerings sold to its own customer base — all built on a persistent per-browser identifier that follows readers across the thousands of publisher sites deploying its beacon.

56. **Google** incorporates the data into the largest advertising business on earth: ad selection and auction pricing, interest-based audience segments, conversion measurement, and cross-site behavioral profiles keyed to Google's own cookies and identifiers.

57. Each Tracking Company accordingly possessed both the capability and the practice of using the intercepted contents for its own purposes, independent of any service to Defendant — the dispositive consideration distinguishing a third-party eavesdropper from a mere recording tool. *See Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921 (C.D. Cal. 2025) (Klausner, J.) (party exception unavailable to advertising companies receiving search queries; they are not "merely providing a tool that aids the website"); *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849 (C.D. Cal. 2024) (Google, Meta, and other ad-tech recipients of search terms are not parties to the communication); *Yockey v. Salesforce, Inc.*, 688 F. Supp. 3d 962, 971 (N.D. Cal. 2023).

### G. Defendant Aided, Agreed With, and Employed the Tracking Companies, Knowingly and for Profit

58. The interceptions occurred because Defendant made them occur. Defendant selected each Tracking Company; registered its own accounts and identifiers with each (including Meta Pixel ID 444187019640480 and LinkedIn Partner ID 2790241); inserted each vendor's JavaScript into the Website's source code; configured the tags to execute on every page, including search-results pages whose URLs Defendant itself designed to embed visitors' verbatim search terms; and maintained that architecture continuously throughout the relevant period — including after Plaintiff's express opt-out.

59. Defendant knew what the code does. Each vendor's marketing and technical documentation — directed at website operators like Defendant — describes precisely what data its tag collects and transmits, and Defendant's contractual agreements with each vendor govern that collection. Defendant is, moreover, a uniquely sophisticated operator: its core editorial product is coverage of the advertising-technology industry itself. Ad Age reports on pixels, programmatic advertising, identity resolution, and data privacy as its stock in trade.

60. Defendant profited from every component of the arrangement: real-time editorial analytics from Chartbeat; advertising revenue from Google; and

audience-building, retargeting, and conversion measurement for Defendant's own paid Ad Age campaigns from Meta and LinkedIn — campaigns Defendant actively runs on both platforms, as the public ad libraries of each confirm (Exs. C [62 LinkedIn campaigns], D [~24 Meta campaigns]).

61. By intentionally embedding, configuring, maintaining, and profiting from the interception architecture, Defendant aided, agreed with, employed, and conspired with each Tracking Company to read and learn the contents of Plaintiff's communications while in transit, within the meaning of § 631(a)'s fourth clause. *Rodriguez*, 762 F. Supp. 3d 921; *Heerde*, 741 F. Supp. 3d 849; *Gabrielli*, 815 F. Supp. 3d 852 (operator's intentional operation of its website and assistance to third parties in gathering user information states a fourth-clause claim).

**H. Plaintiff's Injuries**

62. The interception of Plaintiff's communications is itself a concrete invasion of interests long protected at common law — the privacy of one's communications against secret acquisition by uninvited third parties. *In re Facebook Tracking*, 956 F.3d at 599 (CIPA "codif[ies] a substantive right to privacy, the violation of which gives rise to a concrete injury").

63. Beyond the interception itself, Plaintiff suffered: (a) the disclosure of identity-revealing message content — including his own name and the

identities of the financial institutions and chief executives he researched — to four separate commercial surveillance enterprises; (b) the linkage of that content to Plaintiff's specific identity through Meta's and LinkedIn's identity-resolution cookies and graphs, and its dissemination into advertising and profiling products serving thousands of third-party businesses; (c) the planting of persistent tracking identifiers on his browser — including a LinkedIn cookie engineered to persist for a full year — enabling ongoing cross-site surveillance of Plaintiff; (d) the loss of control over his personal information and the diminution of its value, for which an established commercial market exists; (e) the nullification of his expressly stated tracking preference, registered on every visit; and (f) distress, lost privacy, and a chilling of his willingness to communicate freely with websites, knowing his typed words may be silently broadcast to advertising platforms and data collectors.

64. These harms bear a close relationship to the harms redressed by the common-law actions for intrusion upon seclusion and unauthorized interception of private communications. Unlike plaintiffs whose tracking claims have been dismissed for want of concrete injury, Plaintiff does not rest on an IP address, generic metadata, or speculation: he pleads the verbatim, identity-revealing contents intercepted; the documented mechanism and recipients of each

interception; the identity-linking cookies set on his own browser in the same exchanges; and an express opt-out that Defendant overrode.

**FIRST CAUSE OF ACTION**

**Violations of Cal. Penal Code § 631(a) — Sixty Separate Violations**

65. Plaintiff realleges and incorporates the preceding paragraphs.

66. Plaintiff's search queries were "communications" within the meaning of § 631(a): messages composed by Plaintiff and transmitted by wire from his browser in California to Defendant's servers.

67. The verbatim search terms — embedded in the results-page URLs and transmitted to the Tracking Companies — are the "contents" of those communications: "the intended message conveyed by the communication," not record information. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (a URL disclosing "the specific search terms the user had communicated" may constitute contents); *In re Facebook Tracking*, 956 F.3d at 605 (a full-string URL reveals "the search terms that the user used"); *Heerde*, 741 F. Supp. 3d 849 (search terms transmitted to ad-tech companies are contents); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024) (URLs disclosing search terms are contents under CIPA and ECPA).

68. Each Tracking Company, by means of a machine, instrument, or contrivance — its tracking code executing in Plaintiff's browser together with its receiving servers — willfully read, attempted to read, and learned the contents of Plaintiff's communications while they were in transit, without the consent of all (or any) parties, in violation of the second clause of § 631(a).

69. Defendant willfully aided, agreed with, employed, and conspired with each Tracking Company to commit those acts, in violation of the fourth clause of § 631(a), by intentionally embedding, configuring, maintaining, and profiting from the interception architecture described above.

70. The conduct was willful: the acts were done on purpose, by design, through code Defendant deliberately selected and deployed. Defendant's continuation of identical tracking after Plaintiff selected "Opt-out" — on his very first visit and on every visit thereafter — removes any doubt; Defendant caused the interception of communications it had just been expressly, and repeatedly, told not to touch.

71. Plaintiff did not consent. No prior consent was sought or obtained; the banner is a legally insufficient browse-wrap; the trackers fired before the banner could be acted upon; and the tracking continued in disregard of Plaintiff's express opt-out election.

72. Each acquisition of the contents of each of Plaintiff's search communications by each Tracking Company was a separate, discrete violation.

73. All sixty violations occurred within one year of the filing of the original Complaint and are timely. Cal. Civ. Proc. Code § 340(a).

74. The violations are enumerated as follows:

| # | Date (on or about) | Search query | Recipients | Violations |
|---|---|---|---|---|
| 1 | Oct. 31, 2025 | "VIVEK" (Plaintiff's own name) | Meta, LinkedIn, Chartbeat, Google | 4 |
| 2 | Oct. 2025 | "Jamie Dimon" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 3 | Oct. 2025 | "Brian Moynihan" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 4 | Oct. 2025 | "Jane Fraser" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 5 | Oct. 2025 | "Charlie Scharf" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 6 | Oct. 2025 | "David Solomon" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 7 | Oct. 2025 | "Ted Pick" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 8 | Oct. 2025 | "Richard Fairbank" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 9 | Oct. 2025 | "JPMorgan Chase" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 10 | Oct. 2025 | "Bank of America" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 11 | Oct. 2025 | "Citigroup" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 12 | Oct. 2025 | "Wells Fargo" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 13 | Oct. 2025 | "Goldman Sachs" | Meta, LinkedIn, Chartbeat, Google | 4 |

| | | | | |
|---|---|---|---|---|
| 14 | Oct. 2025 | "Morgan Stanley" | Meta, LinkedIn, Chartbeat, Google | 4 |
| 15 | Oct. 2025 | "Capital One" | Meta, LinkedIn, Chartbeat, Google | 4 |
| | | | **Total** | **60** |

75. Pursuant to Cal. Penal Code § 637.2(a)(1) and (c), Plaintiff is entitled to statutory damages of $5,000 per violation — $300,000 in total — without proof of actual damages, together with injunctive relief under § 637.2(b).

## SECOND CAUSE OF ACTION

## Intrusion Upon Seclusion

76. Plaintiff realleges and incorporates the preceding paragraphs.

77. Plaintiff had an objectively reasonable expectation of privacy and seclusion in the contents of his search communications with the Website — words he composed and addressed to Defendant alone — and in his own browser and device, onto which the Tracking Companies wrote persistent surveillance identifiers. That expectation was not merely assumed; it was reinforced by Defendant's own consent interface, which invited Plaintiff to "select [his] preference," offered an "Opt-out," and thereby represented that visitor tracking was subject to visitor choice — a representation Plaintiff acted on by electing "Opt-out" every time the banner appeared, beginning with his first visit.

78. Defendant intentionally intruded upon that seclusion by deploying and configuring hidden third-party code that seized the contents of Plaintiff's communications in real time, caused persistent identifiers to be planted on Plaintiff's browser, and funneled identity-linked data about Plaintiff into the profiling systems of four commercial surveillance enterprises — before any consent was possible and in direct defiance of Plaintiff's repeated, express refusal of tracking.

79. The intrusion is highly offensive to a reasonable person, and Defendant's circumvention of Plaintiff's opt-out is what makes it so. Defendant's own interface presented Plaintiff a binary choice — "Accept" or "Opt-out" — Plaintiff chose "Opt-out" every time the banner appeared, beginning with his first visit, and Defendant tracked him exactly as though he had chosen "Accept." Soliciting a user's privacy choice and then secretly overriding it is deceit, and courts treat that deceit as the "plus factor" that elevates ordinary data collection into a highly offensive intrusion. *D'Antonio v. Smith & Wesson Inc.*, 820 F. Supp. 3d 928 (N.D. Cal. 2026) (circumventing a visitor's cookie rejection is "deceit," a "plus factor" supporting a highly-offensive intrusion); *Wiley v. Universal Music Grp., Inc.*, 2025 WL 3654085 (N.D. Cal. Dec. 17, 2025) (tracking a visitor who declined cookies states an intrusion-upon-seclusion claim); *Shah v. MyFitnessPal, Inc.*, 2026 WL 216334 (N.D. Cal. Jan. 27, 2026) (same).

Independently of the deceit, every other factor points the same way: the interception was surreptitious; automated and indiscriminate (dozens of covert transmissions per search); it seized identity-revealing message content, including Plaintiff's own name and the financial institutions and executives he researched; it planted tracking identifiers engineered to persist for a full year; and it served a purely commercial motive. At a minimum, whether the conduct is highly offensive presents a fact question that cannot be resolved on the pleadings. *In re Facebook Tracking*, 956 F.3d 589 (offensiveness of tracking practices cannot be resolved at the pleading stage).

80. As a direct and proximate result, Plaintiff suffered the injuries alleged in ¶¶ 62–64, including loss of control over private information, unauthorized identity-linked profiling and dissemination, diminution of the value of his data, distress, and chilled expression, entitling him to compensatory damages in an amount to be proven at trial and alleged in good faith to be not less than $12,500.

81. Defendant acted with malice and oppression within the meaning of Cal. Civ. Code § 3294: it built an architecture that intercepts before consent can be given; presented visitors a sham "preference"; and continued intercepting after Plaintiff's express refusal — a refusal Plaintiff registered on his very first visit and repeated on every visit thereafter — in willful and conscious disregard of

Plaintiff's rights and for profit. Plaintiff is entitled to punitive damages. *See Clauson v. Superior Court*, 67 Cal. App. 4th 1253 (1998) (plaintiff may plead CIPA statutory damages alongside punitive damages on a companion privacy claim, electing remedies at trial).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Statutory damages of $5,000 for each of the sixty violations of Cal. Penal Code § 631(a), totaling $300,000, pursuant to Cal. Penal Code § 637.2;

B. Compensatory damages for intrusion upon seclusion in an amount to be proven at trial;

C. Punitive damages pursuant to Cal. Civ. Code § 3294;

D. Injunctive relief pursuant to Cal. Penal Code § 637.2(b) prohibiting Defendant from intercepting, or aiding others in intercepting, the contents of visitors' communications without prior consent, and from deploying tracking that operates before, or in disregard of, a visitor's consent election;

E. Costs of suit; and

F. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Dated: June 22, 2026

Respectfully submitted,

/s/ Vivek Shah
Vivek Shah